| | | |
|---|---|---|
| GINA HOLSINGER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:16-cv-00003-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Carolyn W.* | ) | |
| *Colvin, Acting Commissioner of Social* | ) | |
| *Security,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Gina Holsinger appeals to the district court from a final decision of the
Commissioner of Social Security (the "Commissioner") denying her application under the Social
Security Act (the "Act") for Disability Insurance Benefits ("DIB").[2] For the following reasons,
the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

On July 25, 2014, Holsinger filed her application for DIB, alleging disability as of
August 15, 2008. (DE 5 Administrative Record ("AR") 192-93). Holsinger was last insured for
DIB on June 30, 2009 (the "DLI") (AR 18), and therefore, she must establish that she was
disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997)
(explaining that with respect to a DIB claim, a claimant must establish that she was disabled as
of his date last insured in order to recover DIB).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d
322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P.
25(d).

[2] All parties have consented to the Magistrate Judge. (DE 9); *see* 28 U.S.C. § 636(c).

Holsinger's claim was denied initially on October 3, 2014, and again on June 20, 2015. (AR 127-35, 137-43). Holsinger filed a request for a hearing before an Administrative Law Judge. (AR 146-48). The hearing office staff indicated that Holsinger's claim was critical need because of her mental state:

> After a review of the evidence, the record indicates that the claimant has two previous suicide attempts via overdose in 2008 and 2009 (Exhibit 16F, p.3). She also was admitted to the hospital in April 2014 with feeling of hopelessness and death wishes (Id.). She added that she was unsure whether or not she could guarantee her own safety (Id.). Accordingly, I have found that the record supports critical need at this time.

(AR 106). On May 12, 2015, Administrative Law Judge Terry Miller (the "ALJ") held a hearing, at which Holsinger, Ann Flaningam, LMFT, LMHC, LSW, and Amy Kutschbach, a vocational expert (the "VE"), testified. (AR 36-105). Holsinger was represented by George Merkle, a non-attorney representative, at the hearing before the ALJ. (AR 36-37). On May 28, 2015, the ALJ issued an unfavorable decision, finding that Holsinger was not disabled because, through the DLI, she was capable of performing a significant number of jobs in the national economy. (AR 16-29). Holsinger requested that the Appeals Council review the ALJ's decision (AR 10), and the Appeals Council denied her request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 1-5).

On January 4, 2016, Holsinger filed a complaint with this Court seeking relief from the Commissioner's final decision. (DE 1). In her appeal, Holsinger alleges that the ALJ erred by: (1) not calling a medical expert to assess her conditions at step two, step three, and in the residual functional capacity (the "RFC") determination; (2) impermissibly "playing doctor" at step three and in the RFC determination; (3) not properly considering evidence of her obesity; and (4) improperly evaluating her credibility. (DE 12 at 16-22).

2

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Holsinger was 47 years old. (AR 43). She has a high-school education and has taken some college courses but did not finish any college programs. (AR 46). She has certificates for early childhood development and for substitute teaching. (AR 47). Holsinger's employment history includes work as an assistant at a residential treatment facility, a substitute teacher, arranging flowers, as a shipping clerk, and at other semi-skilled positions. (AR 47-52, 77).

### B. Holsinger's Testimony at the Hearing

At the hearing Holsinger testified as follows: She lives with her elderly parents in a house that they own. (AR 45, 69). She is about five feet, four inches tall, and weighs approximately 200 pounds. (AR 43-44). She claims that she weighed 160 pounds in 2009. (AR 44). She divorced her former husband in 2009 and has not remarried. (AR 44). She has two adult children who do not live with her. (AR 45). Holsinger does not receive any financial assistance or food stamps. (AR 45). She has a driver's license and is able to drive. (AR 45).

It is difficult for Holsinger to relate to others. (AR 64). Her mood fluctuates and she has strained relationships with her children. (AR 64). Holsinger also isolates herself two to three days a week and has trouble leaving her bed or showering. (AR 65). Two to three days a week Holsinger gets sidetracked when trying to complete tasks at home because she wants to retreat. (AR 66-67). Holsinger has one very good friend who comes over, and usually they stay in and talk. (AR 67-68). On bad days Holsinger does not answer her mobile phone. (AR 69).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 938-page administrative record necessary to the decision.

Holsinger recently held a job from September 2013 to February 2015 at A Friend's House Ministries, a residential treatment facility for women, helping prepare meals and providing other general assistance to residents. (AR 47-48). She stopped working there because she had difficulty working the hours that she was scheduled. (AR 48-49). Towards the end of her time with A Friend's House Ministries, Holsinger missed days frequently, but she handled the job despite problems interacting with residents. (AR 65). She was not fired, however, and left amicably. (AR 65).

Additionally, between 2008 and 2010, Holsinger held positions as a substitute teacher and arranging flowers, among other semi-skilled positions. (AR 50-52). She left those positions due to stress or other difficulties caused by depression or anxiety. (AR 48-52, 77).

Holsinger estimates that she can lift five to 10 pounds, walk two or three blocks, and has trouble sitting. (AR 57). She claims she was diagnosed with post-traumatic stress disorder ("PTSD"), a major depressive disorder with psychotic features, a borderline personality disorder with bipolar features, a generalized anxiety disorder, and agoraphobic tendencies. (AR 58). Due to her PTSD, she experiences night terrors three or four times a week. (AR 59).

Depression causes Holsinger to have trouble leaving the house and to put things off. (AR 60). When Holsinger leaves the house, hears certain sounds, or smells certain scents, she begins to feel anxious, causing her hands to sweat. (AR 61). She sometimes has long periods of crying and has difficulty sleeping. (AR 61). Holsinger's night terrors wake her up frequently during the night, and she has to sleep during the day. (AR 72). When Holsinger naps or goes to bed, she usually sleeps for about four hours. (AR 73).

Holsinger takes Trazodone and Minipress to aide with sleep. (AR 61). Holsinger has seen a therapist, Ms. Flaningam, for psychological counseling once or twice a month since 2008,

and finds it helpful.[4]  (AR 62).  She takes Wellbutrin, a generic form of Remeron and

Clonazepam, and a generic form of Zoloft.  (AR 63).  In 2008, Holsinger was taking Prozac and

Xanax, which sometimes helped with anxiety.  (AR 63-64).

Holsinger does the dishes, the laundry, occasionally "swiffers," but no yardwork or

gardening.  (AR 71-72).  She does not go to church or any type of religious service.  (AR 72).

Holsinger likes to scrapbook but does not do that any longer because it is hard for her to focus.

(AR 72).

In November 2008, Holsinger attempted suicide by overdosing on Trazodone.  (AR 80).

She did this after seeing her therapist and describing painful memories.  (AR 80).  In April 2014,

Holsinger had suicidal thoughts but did not act on them.  (AR 80).  Since 2008, Holsinger has

felt depressed about five to six days a week.  (AR 74-75).  She has difficulty working because

she does not know if she is going to have a good day or a bad day.  (AR 75-76).  Even if she had

a job where she could sit alone she would have a hard time concentrating.  (AR 76).

### C. Ms. Flaningam's Testimony at the Hearing

Ms. Flaningam testified as follows:  She began seeing Holsinger in September 2008 and

saw her extensively in 2009.  (AR 82).  However, Holsinger only saw Ms. Flaningam a little bit

in 2010 and then did not see her again regularly until 2014.  (AR 82).  Ms. Flaningam does not

believe that Holsinger saw another therapist in that time.  (AR 82).  Ms. Flaningam believes that

Holsinger stopped therapy because "of the disorders that she was having."  (AR 82).  Generally,

Holsinger was not always compliant with treatment and Ms. Flaningam suspects this was due to

Holsinger's symptoms and financial issues caused by overspending.  (AR 82).

---

[4] The Court notes a significant gap in Holsinger's treatment with Ms. Flaningam, from June 2010 to March 2014 with one visit in February 2013.  (*See* AR 25).

Ms. Flaningam opined that Holsinger's depression and anxiety started around 2000 when her former husband, who Holsinger alleged was abusive, put stress on Holsinger and exacerbated her mental health issues. (AR 83-84). Holsinger reported to Ms. Flaningam that between 2004 and 2008 she was extremely depressed with anhedonia. (AR 85).

When Holsinger began seeing Ms. Flaningam, she was "very anxious, she couldn't go places, she had not been sleeping, and would maybe only sleep for about an hour at a time . . . ." (AR 85-86). Holsinger reported that she had lost about 60 pounds towards the end of her marriage and felt helpless. (AR 86). Holsinger told Ms. Flaningam that she had suicidal ideation, and had made a plan. (AR 86). Ms. Flaningam opined that Holsinger was exhibiting symptoms typical of major depression, an anxiety disorder, and PTSD, despite taking Prozac, Cymbalta, and Klonopin. (AR 86).

A few months after Holsinger began seeing Ms. Flaningam in November 2008, she overdosed on Trazodone and Klonopin, and contacted Ms. Flaningam. (AR 86). Ms. Flaningam insisted that Holsinger go to the emergency room, and Holsinger complied. (AR 86). There, Dr. Brown and Ms. Flaningam initiated a 72-hour period of detention to keep Holsinger in the hospital, and she was treated by a psychiatrist and prescribed antipsychotic medication. (AR 86-87).

Holsinger continued to see Ms. Flaningam after the emergency room visit, and she exhibited mood instability, sleep disturbance, anger, and lethargy, began to cut herself, and sometimes binged and purged. (AR 87). Holsinger was suspicious and anxious to the point of being psychotic and paranoid. (AR 87). Holsinger had a couple of dating relationships with men, but they were superficial and made Holsinger anxious. (AR 88). Generally, Holsinger had difficulty forming relationships with other people. (AR 87-88). During the period where

Holsinger did not see Ms. Flaningam, Holsinger dated a man, and Ms. Flaningam believed that this may have made Holsinger happy.  (AR 91-92).

Holsinger was hospitalized once in 2011 and twice in 2014.  (AR 88).  The second hospitalization in 2014 was the result of Holsinger being depressed, cutting herself, experiencing flashbacks, hallucinating, and being suicidal.  (AR 88).  Holsinger continued to see Ms. Flaningam in 2014, but found it difficult to be compliant with therapy.  (AR 89).  Holsinger also exhibited difficulty paying bills due to overspending, and she acted out sexually with men on a superficial level.  (AR 89).

Holsinger moved in with her parents in 2014.  (AR 90).  Ms. Flaningam explained that Holsinger lives with her elderly parents, not because they need physical care, but so that she is around in case of an emergency.  (AR 90).  Ms. Flaningam also believes that Holsinger's financial need prompted her to move in with her parents.  (AR 92).  Holsinger lives on the second floor of her parents' house, which allows her to isolate herself from others.  (AR 90). Prior to living with her parents, Holsinger lived alone in an apartment.  (AR 92).

Ms. Flaningam opined that Holsinger's anxiety and extreme dysfunction make it difficult for her to interact with society or develop "good relationships" with other people.  (AR 94).  Ms. Flaningam reasons that Holsinger's symptoms would likely cause her difficulty traveling to and from work, given that she has trouble getting to Ms. Flaningam's office.  (AR 94-95).  In Ms. Flaningam's opinion, the severity of Holsinger's symptoms from 2008 to the present makes it impossible for her to work.  (AR 95).

### D.  Relevant Medical Evidence

#### 1.  Prior to the DLI

On September 1, 2008, Holsinger went the emergency room at Bluffton Regional

Medical Center, and presented with anxiety and depression. (AR 302-04). Holsinger was in the midst of divorcing her husband at the time, and reported suicidal ideation but had no plan. (AR 303). Holsinger reported that she was not sleeping or eating, but she had no self-inflicted injuries or hallucinations. (AR 303). Although she had prescriptions for Xanax and Cymbalta, she had not taken either in a few days. (AR 303). Holsinger reported weighing 190 pounds. (AR 305). Steven Price, M.D., diagnosed her with depression and hypokalemia; instructed her to stay with family until she was better; recommended that she follow up with David Brown, D.O.; and prescribed Xanax and Cymbalta. (AR 304).

On September 18, 2008, Holsinger began seeing Ms. Flaningam, having been referred by Dr. Brown. (AR 736). Holsinger presented with daily depression, insomnia, weight loss, and suicidal ideation with intent. (AR 736). Ms. Flaningam reported that Holsinger felt that she could not face tomorrow and was "thinking of wrecking her car." (AR 736). At the time Holsinger was taking Xanax, Cymbalta, and Klonopin. (AR 737). Ms. Flaningam's report indicates that Holsinger had no auditory or visual hallucinations. (AR 740). Ms. Flaningam diagnosed Holsinger with depressive and anxiety disorders, rule out panic disorder, and rule out major depression. (AR 741). Ms. Flaningam assigned Holsinger a Global Assessment of Functioning ("GAF") score of 43,[5] and noted that her highest GAF score in the past year was 65.

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, various medical providers of record used GAF

(AR 741).  Ms. Flaningam developed a treatment plan for Holsinger including continued therapy, medication, a suicide prevention plan, and divorce care.  (AR 741).

On November 13, 2008, Holsinger went to the emergency room and later was admitted to the intensive care unit at Bluffton Regional Medical Center for overdosing on Trazodone; she had intentionally ingested nine Trazodone pills at once.  (AR 285-302).  Holsinger reported that, just prior to taking the Trazadone pills, her then-husband told her he was going to leave for a long weekend with his mistress, prompting Holsinger to file for divorce.  (AR 289).  Holsinger's stress had been increasing up until then due to emails and text messages involving her children.  (AR 289).  Holsinger reported that she had lost "60 pounds in this whole event."  (AR 289).  Holsinger was tearful and "stunned," but understood the implications of her actions and needed further counseling.  (AR 290).  Holsinger was treated with charcoal and suicide precautions were put in place.  (AR 288).

On November 14, 2008, Dr. Brown filed an application for emergency detention in the Wells Circuit Court, seeking to have Holsinger taken into custody and examined to determine whether she was mentally ill or in need of commitment.  (AR 309-12).  Dr. Brown indicated that Holsinger was a danger to herself and others and in need of immediate restraint due to her history of mental illness.  (AR 310-11).  Holsinger was then admitted to the intensive care unit at St. Joseph Hospital, but was discharged the next day.  (AR 919-28).

Holsinger continued to see Ms. Flaningam following her overdose.  (*See, e.g.*, AR 724-26).  Holsinger reported that her depression was an eight, on a scale of one to 10 in December 2008, and a seven in January 2009.  (AR 725, 726).  During this time, Holsinger reported having

scores in assessing Holsinger, so the GAF is relevant to the ALJ's decision.  *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

difficulty leaving the house, and she struggled with daily depression and anxiety. (AR 724). Holsinger continued to receive treatment from Ms. Flaningam through June 29, 2009, and reported feeling depressed and anxious; she took Xanax and Klonopin. (*See, e.g.*, AR 720-35).

## 2. After the DLI

Holsinger continued to see Ms. Flaningam through June 2010, for depression and anxiety. (695-705). After June 2010, Holsinger ceased seeing Ms. Flaningam until February 5, 2013. (AR 692-93). After her February 2013 visit, Holsinger did not see Ms. Flaningam again until March 13, 2014. (AR 690). She then saw Ms. Flaningam through August 18, 2014, to receive treatment for depression and anxiety. (AR 672-89).

On January 4, 2010, Holsinger was seen at the emergency room in the Bluffton Regional Medical Center for a refill of Prozac and Xanax. (AR 356-61). From November 16, 2012, to February 24, 2014, Holsinger submitted to treatment at Wells Medical Services on 17 occasions. (AR 511-31). Holsinger sought treatment mostly for anxiety and depression, and appears to have been prescribed various medications. (AR 511-31). Her weight during these visits stayed between 199 and 204 pounds. (AR 511-31).

On April 7, 2014, Holsinger was seen at the Parkview Emergency room for flashbacks; presenting as very tearful. (AR 534-54). She was admitted to the intensive care unit and received a psychiatric evaluation. (AR 550). Holsinger reported that she was decompensating mentally and having suicidal thoughts, but she denied suicidal intent. (AR 550). She demanded immediate treatment and stated that the primary reason she submitted to treatment was to obtain medication. (AR 551). She was assigned a GAF score of 51-60. (AR 552). Holsinger's condition improved once she was receiving care and was discharged the next day. (AR 551). Although she denied suicidal ideation, she reported that she could not guarantee her safety for

long. (AR 534).

On April 29, 2014, Holsinger presented to Park Center for an initial assessment. (AR 798-809). Holsinger was tearful, depressed, and anxious during the visit. (AR 802). She had no suicidal ideation and was assigned a GAF score of 53. (AR 802, 805). Holsinger indicated that she was cancelling therapy services with Ms. Flaningam and starting counseling services at Park Center. (AR 798). However, Holsinger continued to see Ms. Flaningam through August 18, 2014. (AR 672).

On May 23, 2014, Holsinger began psychological treatment at Park Center for depression, anxiety, and PTSD. (AR 787-88). She was prescribed Cyproheptadine and Seroquel. (AR 788). On June 24, 2014, Holsinger submitted to psychological treatment at Park Center again. (AR 767). At the time, Holsinger was taking Klonopin, Hydroxyzine Pamoate, Zoloft, Trazodone, and Periactin. (AR 770). She reported suicidal ideation with a plan, and was diagnosed with PTSD. (AR 767, 769). She was not compliant with her treatment plan as she had not started taking Seroquel. (AR 770). She was instructed to decrease her Zoloft, Trazodone, and Periactin medications, and was prescribed Cyproheptadine. (AR 770).

From July 9, 2014, to July 14, 2014, Holsinger voluntarily submitted to inpatient care at Park Center. (AR 623-70). She reported that she was not sure if she could keep herself safe because of suicidal ideation. (AR 668). She presented with severe depression with psychotic features, severe anxiety, and flashbacks. (AR 668). Holsinger also claimed to have hallucinations. (AR 666). She was coherent, although her thoughts were tangential at times. (AR 667). Holsinger admitted to drinking one to two beers three times a week while taking her medications. (AR 667). She was assigned a GAF score of 45. (AR 668). Holsinger continued treatment at Park Center throughout 2014 and 2015. (AR 743-55, 834-91, 901-10). During this

11

time her weight increased from 216 pounds (AR 746) to 241 pounds (AR 904).

On October 1, 2014, Joshua Eskonen, D.O., a state agency physician, and William A. Shipley, Ph.D., a state agency psychologist, reviewed Holsinger's file and determined that there was insufficient evidence to establish a disabling condition prior to the DLI, and that Holsinger did not have a combination of impairments that was severe.  (AR 111-12).  On January 15, 2016, David Everetts, M.D., a state agency physician, and J. Gange, Ph.D., a state agency psychologist, reviewed Holsinger's file and came to the same conclusions as Dr. Eskonen and Dr. Shipley. (AR 121-23).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id*.  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Id*.  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Id*.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Holsinger is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id*. The burden of proof lies with the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5).

claimant at every step except the fifth, where it shifts to the Commissioner. *Id*. at 885-86.

## B. The ALJ's Decision

On May 28, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 16-29). At step one, the ALJ found that Holsinger had not engaged in substantial gainful activity since her alleged onset date of August 15, 2008, through the DLI of June 30, 2009. (AR 18). At step two the ALJ found that Holsinger had the following severe impairments through the DLI: major depression and anxiety. (AR 18-19). At step three, the ALJ found that, through the DLI, Holsinger did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App'x 1. (AR 19-20).

Before proceeding to step four, the ALJ determined that Holsinger had, through the DLI:

> [T]he residual functional capacity to perform a full range of work
> at all exertional levels, but with the following nonexertional
> limitations. These include the inability to understand, remember,
> or carry out detailed or complex job instructions, but retains the
> capacity to perform simple, repetitive tasks on a sustained basis
> (meaning eight hours a day/five days a week, or an equivalent
> work schedule). She would also require work allowing for a
> flexible pace (where the employee is allowed some independence
> in determining either the timing of different work activities, or
> pace of work). Finally, she is limited to only casual/superficial
> interactions with others (i.e. supervisors, coworkers, and general
> public), only occasional interactions with general public, and is
> best suited to working alone, in semi-isolation from others, or as
> part of a small group.

(AR 21). At step four, the ALJ considered this RFC and the VE's testimony before finding that Holsinger could not perform her past relevant work. (AR 27). The ALJ then concluded at step five that there were jobs that existed in significant numbers in the national economy that she could perform. (AR 27-28). Accordingly, the ALJ determined that Holsinger was not disabled

from August 15, 2008, the alleged onset date, through June 30, 2009, the DLI.  (AR 28).

Holsinger's claim for DIB was therefore denied.  (AR 28).

*C.  The ALJ's RFC Determination*
*Is Supported by Substantial Evidence*

It is the province of the ALJ to craft the RFC and to resolve conflicts in evidence when doing so.  *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).  "The administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence— *which need not itself be medical in nature . . . .*"  *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) (quoting *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)).

At the same time, "[w]hen an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion, and he must may not 'play doctor' by using his own lay opinions to fill evidentiary gaps in the record."  *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (citations and internal quotation marks omitted).  The ALJ must articulate which medical or treatment records "provide support for [his] opinion" and not leave the Court guessing "whether there is support for the RFC determination" or "fabricate [the RFC] out of whole cloth."  *Betts v. Colvin*, No. 13-cv-6540, 2016 WL 1569414, at *3 (N.D. Ill. Apr. 19, 2016); *see Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("No doctor concluded that Larson's symptoms were just a response to situational stressors as opposed to evidence of depression.  The ALJ's conclusion to the contrary thus finds no support in the record.").

Holsinger argues that the ALJ erred in the RFC determination by:  (1) not calling a medical expert to review her records and opine as to her limitations, which resulted in the ALJ impermissibly playing doctor; and (2) not calling a medical expert in light of new evidence submitted at the administrative hearing.

15

### 1. The ALJ Did Not Play Doctor by
### Declining to Call a Medical Expert

"Since an RFC is a legal instead of medical conclusion, an ALJ is entitled to assess a claimant's RFC without [a medical source's] guidance when the record is sufficient to do so and when the ALJ adequately explains the basis of his reasoning." *Alma v. Berryhill*, No. 16 C 2035, 2017 WL 2936707, at *13 (N.D. Ill. July 10, 2017). The ALJ may assign limitations based on medical or non-medical evidence, *Simila*, 573 F.3d at 515 (quoting *Wilder*, 64 F.3d at 337); *Diaz*, 55 F.3d at 306 n.2, so long as he "build[s] an accurate and logical bridge from the evidence to his conclusion," *Chase*, 458 F. App'x at 556-57 (citations and internal quotation marks omitted). However, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citations omitted). That is, an ALJ may not substitute his own lay opinion for that of a medical professional. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)); *see, e.g.*, *Bellinghiere v. Astrue*, No. 10 C 6184, 2011 WL 4431023, at *8 (N.D. Ill. Sept. 22, 2011) (remanding case where the medical opinions relied upon by the ALJ to reject the treating physician's opinions were not based on a complete review of the relevant medical evidence, and thus, the ALJ impermissibly substituted her judgment for that of the claimant's treating physicians).

Thus, in certain circumstances, the ALJ should call a medical expert to review a claimant's record when crafting the RFC. *See, e.g.*, *Chase*, 458 F. App'x at 557 ("It is the ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations." (citations omitted)); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (finding that the ALJ "has a duty to solicit additional information

16

to flesh out an opinion for which the medical support is not readily discernable" (citations omitted)); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (concluding that where an examining doctor's report did "not specify whether the condition developed days or months" before the date last insured, he "should have elicited more information to determine when Golembiewski began to have" limitations (citations omitted)); *Ream v. Colvin,* No. 3:14-CV-224-PPS, 2015 WL 1455233, at *4 (N.D. Ind. Mar. 30, 2015) (holding that an "ALJ has a duty to develop a full and fair record[,]" which "means recognizing the need for additional evaluation or testimony where evidence is insufficient." (citations omitted)). But "the lack of an articulated RFC limitation by a record physician does not preclude the ALJ from formulating his own RFC limitations." *Terry v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011); *see Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 18 (1st Cir. 1996) (inquiring "whether substantial evidence support[ed] the ALJ's finding that a claimant retain[ed] the functional capacity to do" a full range of work at all exertional levels with the given limitations in the absence of a medical source's opinion as to functional capacity).

Here, the ALJ explained at length the degree to which medical and non-medical evidence supported the RFC determination. (*See* AR 21-27). Specifically, the ALJ afforded limited or little weight to Holsinger's and Ms. Flaningam's testimonies regarding the severity of Holsinger's symptoms because their testimonies were not supported by evidence in the record. (AR 22-23, 25). The ALJ considered medical records from Holsinger's visits to Wells Medical Services from April 2011 through September 2013, but found them "unremarkable." (AR 25). But the ALJ also found that Holsinger's condition was more severe than opined by the state agency psychologists, explaining that there was "good reason to be sympathetic to [Holsinger's] allegations of her symptoms and functional limitations." (AR 26). The ALJ afforded Holsinger

the benefit of the doubt, and determined that she could perform only simple and repetitive tasks, allowing a flexible pace, only casual and superficial interaction with others, and work where she would be alone, in semi-isolation from others, or in small-group settings.  (AR 21).

Despite the ALJ's detailed RFC analysis, Holsinger contends that the ALJ failed in his duty to "develop a full and fair record" because he did not call a medical expert to opine on her functional limitations.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Holsinger argues that this error caused the ALJ to interpret medical records and "play doctor."  *Chase*, 458 F. App'x at 556-57 (citations omitted).[7]

Holsinger is correct that the ALJ relied primarily on non-medical evidence in determining her RFC, but she fails to appreciate that the ALJ was permitted to do so.  *See Simila*, 573 F.3d at 515 ("The administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—*which need not itself be medical in nature . . . .*" (quoting *Wilder*, 64 F.3d at 337)).  While the ALJ does have an obligation to "recognize[e] the need for additional evaluation or testimony where evidence is insufficient[,]" *Ream*, 2015 WL 1455233, at *4 (citations omitted), Holsinger does not point out a limitation or finding in the ALJ's thorough RFC determination that was not supported by substantial evidence.  In other words, the ALJ "sufficiently articulate[d] his reasoning and the record adequately supports his

_____

[7] Holsinger argues that the ALJ failed in his "duty to develop a full and fair record."  (DE 112 at 17-18 (quoting *Smith*, 231 F.3d at 437)).  Generally, "[t]he ALJ must evaluate the record fairly," *Golembiewski*, 322 F.3d at 917, but Holsinger appears to invoke "the heightened duty that an ALJ owes to unrepresented claimants," *Smith*, 231 F.3d at 443 (citing *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (Ripple, J., dissenting)).  The Court respects that Holsinger was represented by non-attorney Merkle at the administrative hearing (AR 36-37), and will not question his effectiveness, *see Lanzi-Bland v. Berryhill*, No. 16 C 8856, 2017 WL 4797529, at *8 (N.D. Ill. Oct. 24, 2017) (declining to apply the *pro se* standard where the plaintiff was represented by non-attorney counsel before the ALJ because "many non-attorney representatives may be effective advocates for claimants").  Regardless, considering the ALJ's and non-attorney Merkle's questioning of Ms. Flaningam and Holsinger, the 67 exhibits presented at the administrative hearing totaling over 900 pages, and evidence of Holsinger's ability to perform activities and her medications, the Court cannot say that the ALJ failed to develop an adequate record.  *See Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *8 (W.D. Wis. Oct. 18, 2001).

conclusion," such that additional medical expert opinion was not required.  *Terry*, 2011 WL

855346, at *17 (citing 20 C.F.R. §§ 404.1546(c), 404.1527(e)(2) and collecting cases.)

Holsinger's contention that the ALJ played doctor and used his own lay opinions to fill

evidentiary gaps in the record also fails.  First, Holsinger has not drawn the Court's attention to a

limitation where the ALJ interpreted medical evidence and "determin[ed] the significance of [a]

particular medical finding[]" himself.  *Moon*, 763 F.3d at 722 (citations omitted).  Second, as

discussed *supra*, the limitations assigned by the ALJ were supported by evidence in the record;

he did not make independent findings to fill gaps in the record.  *Rohan*, 98 F.3d at 970 ("[The

ALJ] independently evaluated the evidence in this case and improperly substituted his judgment

for that of Dr. Shapiro."); *see Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) ("The ALJ

impermissibly 'played doctor' and reached his own independent medical conclusion when he

determined that [t]he level of treatment received also fails to infer limitations beyond the

limitations described above in this decision.  The claimant does not even take insulin." (alteration

in original) (internal quotation marks and citations omitted)); *Blakes ex rel. Wolfe*, 331 F.3d at

570 ("Moreover, the ALJ seems to have succumbed to the temptation to play doctor when she

concluded that a good prognosis for speech and language difficulties was inconsistent with a

diagnosis of mental retardation because no expert offered evidence to that effect here." (citation

omitted)).

Finally, none of the ALJ's limitations conflict with an opinion of a medical source of

record.[8]  *Cf. Chase*, 458 F. App'x at 557 (remanding where the ALJ determined that the claimant

could perform sedentary work by lifting his foot 15 to 20 degrees, whereas the claimant's

---

[8] To the extent that the RFC determination conflicts with Ms. Flaningam's testimony that Holsinger is
completely unable to work, this argument will be addressed *infra*.

treating physician had opined that the claimant needed his foot elevated to 90 degrees). "Simply asserting that the ALJ must have 'invade[d] the medical province' is insufficient. [Holsinger] was required to present evidence that it was necessary for the ALJ to call a medical expert." *Martinez v. Colvin*, No. 12 CV 50016, 2014 WL 1305067, at *14 (N.D. Ill. Mar. 28, 2014) (alternation in original) (quoting *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007)).

In summary, the ALJ in crafting the RFC appropriately considered the evidence in the record, explained his reasons for crediting or discrediting the evidence, and connected the evidence to his conclusion. *See Terry*, 2011 WL 855346, at *17 ("[T]he RFC determination is one firmly within the ALJ's discretion to determine, so long as he sufficiently articulates his reasoning and the record adequately supports his conclusion." (citations omitted)). The lack of medical sources regarding Holsinger's limitations merely highlights her failure to meet her "burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)). Accordingly, Holsinger's arguments that the ALJ erred by not calling a medical expert and playing doctor are unpersuasive.

### 2. The ALJ Was Not Required to Call an Expert in Light of New Evidence

Next, Holsinger argues that the ALJ should have called a medical expert because the state agency psychologists did not consider "new evidence [] obtained concerning Ms. Holsinger's pre-DLI impairment" that was "submitted at the hearing." (DE 12 at 16). Holsinger does not

identify this new evidence. The Court notes that the only evidence presented at the hearing that was not a part of Holsinger's record at the time of the state agency psychologists' review, was: (1) Ms. Flaningam's testimony that Holsinger was completely unable to work; and (2) Ms. Flaningam's testimony that Holsinger's symptoms and financial issues caused her gap in treatment.[9]

Whether a claimant is able to work is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(d); *see Barnett*, 381 F.3d at 669 ("Further, although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary." (citing SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996))). At the same time, the ALJ "must 'evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.'" *Long v. Comm'r Soc. Sec.*, No. 2:15-CV-408-JEM, 2017 WL 1161012, at *3 (N.D. Ind. Mar. 28, 2017) (quoting SSR 96-5p, 1996 WL 374183, at *3, 5). "[A]n ALJ is entitled to assess a claimant's RFC without an expert's guidance when the record is sufficient to do so and when the ALJ adequately explains the basis of his reasoning." *Alma v. Berryhill*, No. 16 C 2035, 2017 WL 2936707, at *13 (N.D. Ill. July 10, 2017); *see Covington v. Colvin*, No. 1:13-CV-00363-SEB, 2014 WL 4961153, at *16 (S.D. Ind. Sept. 29, 2014) ("Unless the record is insufficient, which in this case it was not, there is no need for an ALJ to seek additional medical opinions." (citing *Skinner*, 478 F.3d at 844)).

Here, the ALJ thoroughly examined Ms. Flaningam's opinion that Holsinger was unable

---

[9] It is not clear, and Holsinger does not argue, how Ms. Flaningam's testimony regarding Holsinger's gap in treatment would have modified the state agency psychologists' RFC assessment. Rather, this issue goes to the credibility of Holsinger's symptom testimony. Accordingly, the Court will discuss this issue in the section of this Opinion regarding Holsinger's credibility.

to hold a job because of her symptoms. (AR 23). However, the ALJ found this opinion was not supported by Ms. Flaningam's treatment records and other evidence. For example, from 2008 to 2010 Holsinger held positions as a substitute teacher, arranging flowers, and at a drive-in restaurant (AR 50-53, 711); in 2008, Holsinger traveled to Idaho and California (AR 733-34, 922, 926); in June 2010 Holsinger was dating a man (AR 696; *see* AR 87-88 (testifying that Holsinger had difficulty forming relationships with people but was able to date superficially)); and Ms. Flaningam testified that Holsinger was dating a man during her gap in treatment (AR 91-92).

Accordingly, the Court finds that the ALJ complied with his obligation to determine whether the "new evidence" that Holsinger could not work was "supported by the record.'" *Long*, 2017 WL 1161012, at *3 (citation and internal quotation marks omitted). Because the ALJ "adequately explain[ed] the basis of his reasoning," *Alma*, 2017 WL 2936707, at *13, and because Holsinger's ability to work is a determination reserved to the ALJ, 20 C.F.R. § 404.1527(d), the ALJ did not err in refraining from calling a medical expert to opine on Holsinger's limitations in crafting the RFC.

## D. The ALJ Did Not Err in the Step-Three Determination

Next, Holsinger argues that an additional medical expert opinion was required at step three to determine whether she met or equaled a listed impairment.

By way of a brief summary, at step three the ALJ determined that Holsinger did not meet or medically equal any impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1, prior to the DLI. (AR 19). The ALJ considered whether Holsinger satisfied the "paragraph B" criteria for Listings 12.04 and 12.06, which require the claimant to show that her impairments result in at least two of the following:

> [M]arked restriction of activities of daily living; marked
> difficulties in maintaining social functioning; marked difficulties in
> maintaining concentration, persistence, or pace; or repeated
> episodes of decompensation, reach of extended duration. A
> marked limitation means more than moderate but less than
> extreme. Repeated episodes of decompensation, each of extended
> duration, means three episodes within 1 year, or an average of once
> every 4 months, each lasting for 2 weeks.

(AR 19); *see* 20 C.F.R. § 404, Subpt. P, App'x. 1, 12.00(b). The ALJ evaluated the evidence in

the record including evidence of Holsinger's living conditions, romantic and social relationships,

work activities, and recreational activities. (AR 20). The ALJ found that Holsinger's symptoms

did not cause at least two marked limitations or one marked limitation and repeated episodes of

decompensation, each of extended duration as required under paragraph B. (AR 19-20). The

ALJ also found that Holsinger failed to provide evidence that would support a finding that she

experienced a residual disease process as required by the paragraph C criteria prior to the DLI.

(AR 20).

"The responsibility for deciding medical equivalence rests with the administrative law

judge or Appeals Council." *Barnett*, 381 F.3d at 668 (citing 20 C.F.R. § 404.1526(e)(3))

(collecting cases); *see Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§

404.1517, 416.917). The Seventh Circuit recognizes that the ALJ has discretion whether to call

an expert on the issue of medical equivalence. *Barnett*, 381 F.3d at 668 (citations omitted);

*Foster*, 279 F.3d at 355 (citations omitted).

Here, the ALJ gave a detailed analysis at step three and specifically explained why

Holsinger did not satisfy the criteria for paragraphs B or C. Further, two state agency

psychologists had recently evaluated Holsinger's record, which included Ms. Flaningam's

treatment records, and determined that there was insufficient evidence to evaluate her claim of

disability. (AR 111, 121). It is not clear, and Holsinger does not argue, how Ms. Flaningam's testimony that Holsinger's symptoms prevented her from holding a job and caused her gap in treatment, would have affected the state agency psychologists' opinions as to medical equivalence. *See Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (finding that the claimant "did not present any medical evidence supporting the position that his impairments meet or equaled a particular listing" (citation omitted)).

Moreover, Holsinger admits that the ALJ has discretion concerning whether to call a medical expert for the purpose of determining medical equivalence. (*See* DE 12 at 17 ("[SSR] 96-6p requires the ALJ to obtain an updated medical expert opinion if, 'in the opinion of the administrative law judge,' additional medical evidence may change the State agency consultant's finding on equivalence." (quoting SSR 96-6p, 1996 WL 374180, at *4 (July 2, 1996))). The ALJ discussed Holsinger's impairments in detail and referred to numerous exhibits, he reviewed evidence of her hospital visits, he reviewed Ms. Flaningam's treatment records, and he "summarized [Holsinger's] statements regarding her pain and assessed her credibility." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). "[A]n ALJ is not required to provide a 'complete written evaluation of every piece of testimony and evidence,' and [the Court] finds that the ALJ's determination with respect to step three was supported by substantial evidence."[10] *Id*. (quoting *Diaz*, 55 F.3d at 308)

### E. Evidence of Holsinger's Obesity Does Not Require a Remand

Holsinger argues that at step two the ALJ did not consider evidence that she suffered

---

[10] Holsinger also argues that the ALJ interpreted raw medical evidence and "played doctor" at step three of his analysis. However, the Court addressed this argument with regards to the RFC *supra*, and at step three, the ALJ is empowered to decide the issue of medical equivalence and may do so by evaluating medical and non-medical evidence. *Barnett*, 381 F.3d at 668 (citations omitted); 20 C.F.R. §§ 404.1520(e); 404.1526(c).

from Level I obesity prior to the DLI. Holsinger points out that her body-mass index ("BMI") was between 30.00 and 34.9 in the months leading up to the DLI. *See generally* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).

Holsinger's argument, while phrased in terms of an error at step two, is actually an argument that the ALJ erred in his RFC determination. (*See* DE 12 at 19); *see also Arnett*, 676 F.3d at 591; *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) ("We cannot conclude that it was harmless here because the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination . . . ."); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *22 (N.D. Ill. Nov. 18, 2011) (rephrasing the claimant's argument that the "ALJ erred by not including her mild Step Two mental limitations in the RFC").

According to SSR 02-1p, a BMI of 30.0 or above is described as "obesity." SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002). Even though Holsinger did not cite obesity as an impairment, the ALJ was still obligated to "consider any limiting effects of obesity on a claimant's overall condition . . . ." *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (citations omitted). However, "the claimant must articulate how her obesity limits her functioning and exacerbates her impairments." *Id.* (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Here, medical reports show that Holsinger, who is 5 feet 4 inches tall, weighed 170 pounds in November 2008 (AR 287), 193 pounds in January 20009 (AR 313), 190 pounds in March 2009 (AR 318), and 215 pounds in April 2011 (AR 370). Her BMIs would be 32.61, 33.12, 32.61, and 36.9 respectively. Thus, Holsinger is correct that the record reflects objective evidence of obesity from November 2008 through the DLI.

Unfortunately for Holsinger, she failed to assert at the administrative hearing how her obesity limits her ability to work. The ALJ questioned Holsinger on her physical impairments, and while she mentioned pain in her lower back and legs, she denied experiencing any other physical limitations. (AR 53). Even in her brief, Holsinger fails to identify how her obesity affects her ability to work, other than asserting that "[i]t is clear that Ms. Holsinger's obesity would further aggravate her depression." (DE 12 at 19). The Seventh Circuit "has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity." *Hisle*, 258 F. App'x at 37 (citing *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504); *see Dornseif v. Astrue*, 499 F. App'x 598, 600 (7th Cir. 2013). The ALJ reviewed the medical records documenting Holsinger's obesity and concluded that it did not support a significant weight gain due to depression as Holsinger alleged. (AR 21). Therefore, Holsinger's claim that the ALJ erred by not considering the limitations of her obesity fails. *See Hisle*, 258 F. App'x at 37.

### F. The ALJ's Credibility Determination Is Supported by Substantial Evidence

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th

Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

Here, the ALJ found that the evidence in the record supported the conclusion that Holsinger's symptoms "were not sustained but improved with treatment; otherwise, the treatment record supports no more than possibly moderate symptoms/functional limitations and significant contemporaneously reported involvement in daily activities." (AR 23). The ALJ concluded that Holsinger's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Holsinger's] statements concerning the intensity, persistence, and limiting effect of these symptoms [were] not entirely credible . . . ." (AR 24).

Holsinger argues that the ALJ's credibility determination was flawed because: (1) he failed to call a medical expert, resulting in a flawed understanding of Holsinger's condition; (2) he failed to view the lack of medical evidence in the record as a result of Holsinger's symptoms; and (3) he did not consider the circumstances and difficulties Holsinger experienced while performing daily activities.

### 1. A Medical Expert Was Not Required

Holsinger's first argument is that the ALJ's credibility determination was flawed because, without the opinion of a medical expert, the ALJ's understanding of Holsinger's condition and symptoms was unsupported. Holsinger claims that such a flawed understanding is an "objective factor[] or fundamental implausibilit[y]" that allows the Court to scrutinize the ALJ's opinion more than it would for an alleged error based on subjective factors. (DE 12 at 21 (quoting

*Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013))). It is true that "courts have greater freedom to review the ALJ's" credibility determination when it "rests on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor]." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (alteration in original) (citations and internal quotation marks omitted).

However, Holsinger fails to cite authority supporting her argument that the lack of a medical expert's opinion is such an "objective factor." Indeed, even if the ALJ had elicited the opinion of an additional medical expert, he would not have been obligated to adopt that expert's opinion in his credibility determination. *See, e.g.*, *Clifford*, 227 F.3d at 871 ("If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant." (citations and internal quotation marks omitted)). Therefore, Holsinger's argument that the ALJ's credibility determination was patently wrong because he did not call a medical expert fails. *See Powers*, 207 F.3d at 435.

## 2. Holsinger's Lack of Treatment

Second, Holsinger contends that the ALJ committed error when he viewed her gaps in treatment unfavorably. In support of her argument, Holsinger relies on SSR 96-7p, which provides that "the adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek treatment without first considering any explanation that the individual may provide."[11] SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see*

---

[11] Social Security Ruling 96-7p, was superseded by Social Security Ruling 16-3p, 2016 WL 1119029 (Mar. 16, 2016), in March 2016, but Social Security Ruling 96-7p governed at the time the ALJ issued his decision. Accordingly, SSR 96-7p applies to this case.

*Hoffman v. Astrue*, No. 10-C-1152, 2011 WL 3236176, at *10 (E.D. Wis. July 27, 2011).

Here, the ALJ considered Ms. Flaningam's opinion that Holsinger's gap in treatment was due to her symptoms which prevented Holsinger for interacting with society. (*See* AR 22-23). However, the ALJ found that Ms. Flaningam's testimony was belied by other evidence in the record. Specifically, Ms. Flaningam's treatment records in February, April, May, and June 2010—that is, the months immediately preceding Holsinger's gap in treatment—show the following improvements in Holsinger's condition: sleeping more and feeling less depressed (AR 705); normalized feelings and reactions (AR 703); improved energy and motivation (AR 702); dating a man (AR 696, 700); plans to starting on-line classes at community college (AR 699); improved symptoms of depression, sleep, energy, motivation, and anxiety (AR 697-98); and "[f]eeling better [about] herself" and having a "great weekend" with her children (AR 696). The ALJ also considered Ms. Flaningam's testimony that financial issues—evidenced by Holsinger cohabitating with her parents—prevented Holsinger from seeking treatment. But because Holsinger received treatment from Wells Medical Services on 17 occasions between November 2012 and February 2014 (AR 511-31), the ALJ found that financial difficulty did not likely prevent Holsinger from seeing Ms. Flaningam. (*See* AR 23).

Thus, contrary to Holsinger's assertions, the ALJ complied with SSR 96-7p. He considered evidence in the record concerning Holsinger's gap in treatment before making an inference against Holsinger. *Craft*, 539 F.3d at 679. Moreover, the ALJ logically and accurately connected this evidence to his conclusion that Holsinger's symptoms did not cause her gap in treatment. *See Chase*, 458 F. App'x at 556-57 ("When an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion . . . ." (citations and internal quotation marks omitted)). Therefore, Holsinger's argument that the ALJ erred by not

29

considering her proffered reasons for failing to seek treatment lacks merit, and the Court will not disturb the ALJ's finding on this issue.

### 3. Evidence of Holsinger's Activities

In her final argument, Holsinger contends that the ALJ's analysis of her work activity, dating, college attendance, and living situation was not complete because the ALJ did not consider the difficulties or lack of success Holsinger had in performing these activities. Holsinger supports her argument by citing Ms. Flaningam's testimony and her own testimony that these activities were, in fact, difficult for her. Holsinger does not contest that the ALJ was permitted to weigh her credibility by analyzing her daily activities, duration of her symptoms, and the effectiveness of treatments, among other factors. *See* SSR 96-7p, 1996 WL 374186, at *3 (listing factors the ALJ can consider when evaluating a claimant's credibility).

The ALJ determined that Holsinger's symptom testimony was not entirely credible in light of evidence that she lived and traveled independently, did laundry, cleaned, shopped, managed her finances, had relationships with men, and engaged in limited social activities. (AR 19-20, 23, 26). The ALJ's failure to discuss Holsinger's difficulty or lack of success in carrying out these activities is excused because the "ALJ need not mention every snippet of evidence in the record," where, as here, he connects the evidence to the conclusion. *Arnett*, 676 F.3d at 592. Moreover, the RFC determination incorporates restrictions for a flexible pace, causal or superficial interactions with others, and occasional interactions with the general public (although, she is best suited working alone in semi-isolation). (AR 21). The "ALJ did not totally discount [Holsinger's] testimony regarding" her ability to perform certain activities. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). Thus, the ALJ's credibility determination was not "patently wrong," and will be upheld. *Powers*, 207 F.3d at 435.

30

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Holsinger.

SO ORDERED.

Entered this 29th day of March 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge
